NOTICE

Decision filed 07/10/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240795-U

NO. 5-24-0795

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| APRIL B. MOORE, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant and Cross-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 17-L-608 |
| | ) | |
| SHERRY K. RADAE, | ) | Honorable |
| | ) | Dennis R. Ruth, |
| Defendant-Appellee and Cross-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justice McHaney concurred in the judgment.[*]

**ORDER**

¶ 1    *Held*:    We affirm the trial court's judgment where the trial court correctly decided the extraterritorial effect issue, the trial court's factual findings were not against the manifest weight of the evidence, the acts supporting the cause of action did not primarily and substantially occur in Illinois, and the plaintiff was not denied due process.

¶ 2    The plaintiff, April B. Moore, appeals the trial court's judgment in favor of the defendant, Sherry K. Radae. The complaint set forth a single claim arising from the alleged alienation of affections of the plaintiff's spouse, Robert Dean Moore (Moore), by the defendant. The trial court denied the claim after determining that the most significant events supporting the claim occurred in Missouri, and that the Alienation of Affections Act (Act) (740 ILCS 5/0.01 *et seq.* (West 2014))

_____

[*]Justice Moore fully participated in the decision prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

1

did not have extraterritorial effect. The plaintiff appeals this determination, arguing that the trial court improperly conducted the analysis and violated the plaintiff's due process rights. The defendant's cross-appeal asks this court to review several of the trial court's findings of fact, but only if the judgment is not affirmed. For the reasons set forth below, we affirm the trial court's judgment and deem the cross-appeal moot.

¶ 3                               I. BACKGROUND

¶ 4     Moore and the plaintiff were married on May 4, 2013, in Florida. Moore was a top executive at his uncle's Ohio coal company where he earned, on average, over $10 million annually. The plaintiff was an attorney, and her practice involved the coal industry and its regulation. During the marriage, the couple lived in separate residences in Ohio and had one child together, born in early 2014. In early 2015, Moore successfully led a corporate takeover of a rival coal company headquartered in downtown St. Louis, Missouri. The defendant was an executive secretary at the St. Louis company, and Moore became acquainted with the defendant incident to the takeover. Shortly after meeting, in May 2015, Moore and the defendant began a romantic relationship. At the time, the defendant lived in Worden, Madison County, Illinois.

¶ 5     Some months later, the plaintiff learned of the relationship, and she filed for divorce from Moore in Ohio in January 2016. While the plaintiff later dismissed that action, Moore had counter-sued for divorce, and the marriage was ultimately dissolved in Ohio. On May 8, 2017, while the divorce was still pending, the plaintiff filed a complaint in Madison County, Illinois, the subject of this appeal, claiming that the defendant violated the Act. The complaint alleged that the defendant, after learning that she would likely lose her well-paying job pursuant to the corporate takeover, engaged in a course of conduct and committed overt acts to intentionally entice Moore away from the plaintiff. Over the next six-and-a-half years of the case, several motions were filed

2

and resolved, including motions by the defendant to dismiss the action, to disqualify the plaintiff's counsel, and for summary judgment. Discovery issues were also addressed during that time period. The case then proceeded to a bench trial.

¶ 6    The bench trial began on December 11, 2023, wherein the plaintiff proceeded *pro se* and the defendant was represented by counsel. Prior to opening statements, the trial court addressed the parties regarding its concern about the location of the alleged conduct. The trial court noted that Missouri had done away with its alienation of affection statute in 2003, Ohio had done the same in 1978, and Illinois had done the same in January 2016. The trial court stated that it had "serious concern and issue as to what the choice of law [was] and the viability of an alienation of affection case in the state of Illinois," where the marriage was localized in Ohio and the defendant's employment was located in an office in St. Louis, Missouri. The trial court also noted that no motions had been filed regarding the issue of choice-of-law or the viability of a claim under Illinois law, and in doing so also expressed a question as to whether those were separate or combined issues. The plaintiff responded that the complaint alleged that the tort had occurred in Illinois, and so the issue was ripe for decision in Illinois. The trial court noted that the allegation of the tort occurring in Illinois did not necessarily amount to the occurrence of the tort in Illinois. The parties were then alerted that they would be required to brief that issue.

¶ 7    The bench trial commenced and, except where otherwise noted, the defendant provided the following testimony. In September 2000, she worked at a family-owned lumber company. In 2004, she married the son of the lumber company owner who was also employed there, and they had a child together. They later divorced in January 2011, and she left her employment at the lumber company in April 2011. At that time, the defendant was pregnant with a child from a different

3

man, Jeremy Bradford. The defendant began working for Ameren in February 2012 and then went to work for the St. Louis coal company in August 2013.

¶ 8    After the January 2011 divorce, Bradford, the father of the defendant's second child, lived in the defendant's home with her on and off until May 2015. Prior to his moving out, in March 2015, the defendant learned that she would be losing her job at the St. Louis company when she was informed of the acquisition of the St. Louis company by Moore's uncle's company. On March 12, 2015, she sent a text message, the recipient of which she could not recall, stating that she made over $88,000 the previous year, and she did not believe she would find that salary again. Also in March 2015, the defendant claimed that she was offered a retention package by the St. Louis company where, if she stayed on with the company until September 1, 2015, to assist with the transition to the new ownership, she would receive a total of approximately $139,000. As the St. Louis company was comprised of multiple entities, one retention package offer was in the amount of $100,000 from one entity, and the other was for $39,000 from another entity.

¶ 9    The defendant met Moore in April 2015 when he visited the St. Louis office pursuant to his anticipated new role as chief executive officer (CEO) of the St. Louis company. At that time, he was wearing a wedding ring, and the defendant knew that Moore was married. Moore, however, testified that by the time he met the defendant, pursuant to marital strife with the plaintiff, he was already "done" with his marriage. When he met the defendant, Moore found her to be pleasant, easy to get along with, and was attracted to her.

¶ 10    Prior to the defendant's testimony, the plaintiff had questioned an AT&T wireless communication service representative. She stated that communications through smartphone applications and services that operated on wireless internet, rather than cellular telephone networks, would not be reflected in either the cellular telephone call logs or text message logs that

4

had been produced by AT&T pursuant to a subpoena. Both FaceTime calls, Apple's iPhone-exclusive video call application, and a certain method of text messaging on iPhone, known as iMessage, operated on wireless internet. As a result, neither FaceTime calls nor iMessages would have been captured within the documents produced by AT&T. When wireless internet was not available, however, some text messages could go through the cellular network and therefore would be captured. The AT&T records reflecting telephone and text messages transmitted through the cellular network were admitted into evidence.

¶ 11    The defendant testified that Moore obtained her personal cellular telephone number incident to their second meeting in late April 2015, when she texted him in a professional capacity to assist with directions from the St. Louis office to the airport. Moore then sent his first non-professional text message to the defendant later that evening, and she responded. From that time on, the defendant and Moore texted each other "nonstop." The defendant would sometimes initiate communication with Moore when she had a work-related matter to address, but non-professional calls and texts were always or almost always initiated by Moore. Moore also testified that he initiated the non-professional communications with the defendant.

¶ 12    The defendant explained that both she and Moore had iPhone smartphones, and they communicated utilizing iMessage, FaceTime, and voice calls. At some point, Moore told the defendant to communicate with him exclusively through his iPhone. While copies of their text messages were requested by the plaintiff in discovery, the defendant had changed smartphones multiple times since 2015. She also had a setting activated that caused her text messages to delete after a set period—she believed it was 30 days—and so she claimed she did not have copies of any of her text messages with Moore from 2015 to provide in discovery. No evidence was elicited or

5

offered at trial regarding where the defendant was geographically located while engaging in telephone contact with Moore.

¶ 13    Moore asked the defendant to go on dates with him on several occasions in early May, always making those requests in person. After declining five or six times, the defendant agreed to go to dinner with Moore pursuant to an invitation he made at the St. Louis office. Bradford still lived with the defendant at the time, but their romantic relationship had ended, and the defendant was giving Bradford time to move out of the home.

¶ 14    The defendant and Moore had their first date on May 6, 2015. The defendant picked Moore up from the St. Louis office at Moore's request and they went to dinner in University City, St. Louis, Missouri. During that dinner, Moore leaned over and kissed the defendant. After dinner, the defendant dropped Moore off at the St. Louis office between 11 p.m. and midnight, and the defendant then went out with friends until around 2 or 3 a.m. The next day, Moore came to the defendant's office and they talked. For the rest of May, Moore was in the St. Louis office for a couple of days every other week. He continued to initiate contact with the defendant via text message and would speak to her when he came to the St. Louis office.

¶ 15    Around May 20, 2015, Moore and the defendant had their second date where they again went to dinner in St. Louis. The defendant did not recall Moore wearing a wedding ring on the second date. Both the defendant and Moore testified that he informed the defendant on this date that he was getting a divorce. After dinner they went for a walk and Moore kissed the defendant for the second time. She then dropped Moore off at his hotel but did not go inside. Moore continued to initiate telephone communication with the defendant after that.

¶ 16    The next time they saw each other was a few weeks later in June 2015 when Moore visited the defendant's home for the first time and stayed overnight. On that day, Moore contacted the

6

defendant and stated that he was in Illinois and would like to see her for dinner. She informed him that she was unavailable because she was home with her children. Without notice or invitation, Moore arrived at her home. The defendant did not know how Moore had obtained her address. She let Moore in and he stayed the night, although the two were not intimate that night. Moore met the defendant's son, and in the morning, he showered and left.

¶ 17    According to the defendant, prior to that first visit to her home, Moore would stay in St. Louis when he came to the area. After June of 2015, he would stay at the defendant's home in Illinois. The St. Louis company owned a condominium in St. Louis, and Moore testified that through June and July of 2015, when he would come to the area for work, he would either stay at a hotel, at the company's condominium, or at the defendant's home. No evidence was elicited or offered regarding how often Moore visited the area during this time period or how many times he stayed with the defendant.

¶ 18    Moore testified that he invited the defendant to his home in Belmont, Ohio, for the Fourth of July weekend. Moore offered to pay for the defendant's plane ticket, but she refused. The defendant testified that she purchased her own ticket. She was not aware at that time that Moore had another home about 100 miles away from Belmont in Columbus, Ohio, where his wife and child lived. When the defendant arrived at the Belmont home, she saw no indication of a woman living there. She continued to believe that Moore was in the middle of a divorce. It was on that visit to Ohio that the defendant was intimate with Moore for the first time. He initiated the sexual encounter.

¶ 19    Later in July the defendant introduced Moore to her father, her sister, and their spouses. Moore had been at the defendant's home for a visit. She informed Moore that she attended regular Sunday dinners with her family. Moore stated that he would attend that Sunday's dinner, and he

7

did so. No evidence was elicited or offered as to the location of that event. Also in late July 2015, the plaintiff testified that home décor items were purchased using Moore's credit card, including a rug and possibly other items, and the shipping address listed on the purchase document was the defendant's home.

¶ 20     The defendant testified that Moore next invited the defendant to accompany Moore to New York where he had some business meetings, and around August 6, 2015, the defendant and her son flew to New York to join Moore. The defendant purchased the plane tickets and Moore paid for her hotel. The defendant later sent Moore a thank-you note stating multiple times that she loved him.

¶ 21     The plaintiff testified that she received a series of approximately nine anonymous letters beginning around the end of July 2015, essentially urging her to end her marriage pursuant to Moore's affair with the defendant. The plaintiff did not save any of the envelopes but recalled that the letters were postmarked from Pittsburgh, Pennsylvania; Columbus, Ohio; and West Virginia. The plaintiff was sure that none of the letters were postmarked from Madison County, Illinois, and could not recall if any were postmarked from St. Louis. She informed Moore about the letters the weekend of August 29, 2015. During this conversation, Moore confessed to having an affair.

¶ 22     The defendant was asked during her testimony if she had anything to do with sending the letters and denied any involvement. She stated that in August 2015, Moore informed her of the letters and asked her if she knew anyone who could have sent them. The defendant suggested to Moore that it might have been Bradford. The defendant testified that also around the end of August 2015, Moore informed her that his divorce would not be amicable and things were going to get ugly.

¶ 23    Moore flew by private plane to Alton, Illinois, on September 4, 2015, and went to visit the defendant at her home. The plaintiff testified that Moore returned to Columbus, Ohio, the next day, where she informed him that she had received a copy of another letter dated September 1, 2015. This letter had been anonymously sent to the St. Louis company's general counsel and other company executives, as well as to the plaintiff, informing them of the affair between Moore and the defendant. Attached to the letter was a copy of the thank-you note that the defendant had sent Moore after the New York trip. Moore testified that the plaintiff had accessed the bag where he kept the note, and that he believed the plaintiff was responsible for sending it to the company and herself. The plaintiff testified that Moore had accused her of sending that letter herself, but she stated that she would not "give that any air" and questioned what her motive would be for doing so.

¶ 24    Moore testified that he engaged an Ohio attorney around September 9, 2015, that the plaintiff retained her own attorney shortly thereafter, and Moore's communications with the plaintiff from that time on were funneled through the attorneys. They were trying to work out a visitation schedule for their minor child.

¶ 25    The plaintiff testified that around September 11, 2015, she sent the defendant an email essentially requesting that she stop the affair with Moore. The defendant confirmed that the email address where the email was sent was her work email, and that she worked at the company at the time the email was sent, but she denied ever receiving the email. The plaintiff testified that by September 16, 2015, she had retained counsel in Illinois to pursue an alienation of affections case against the defendant. By September 22, 2015, she had retained additional counsel to represent her in divorce proceedings in Ohio.

¶ 26 The defendant testified that throughout 2015, she flew to Ohio to see Moore approximately five or six times. Flight records of the defendant indicate visits to Ohio occurring September 18-21, October 2-5, and October 16-19. Moore also came to the defendant's home in Illinois multiple times, but no evidence was elicited or offered to establish how often this occurred. The defendant and Moore went on a cruise departing from Florida on November 12-16. Moore invited the defendant on the cruise. She then went to see Moore for Thanksgiving in Ohio, which occurred on November 26, 2015, and flight records indicate a return date of November 29. The flight records indicate additional visits by the defendant to Ohio on December 11-14 and December 25-29. She paid for each flight herself, although Moore may have paid for the flight to Florida for the cruise, and the defendant always flew out of St. Louis. Each time, she went pursuant to Moore's invitation, and all of the invitations were made verbally. The trial court asked the defendant if, after their first sexual encounter in June, Moore and the defendant had sexual encounters each time they were together, and the defendant responded, "It never ended."

¶ 27 Throughout 2015, the defendant did not tell anyone at the St. Louis company about the relationship, but it was her understanding that Moore reported it in September 2015. The defendant was never asked about the relationship by anyone at the St. Louis company; however, within a few weeks after Moore's disclosure, the defendant received $100,000 from the St. Louis company where Moore had by then become CEO. The defendant claimed that this payment was pursuant to the retention offer made back in March. In November 2015, the defendant went back to work for Ameren. She worked there until February 2018 and then went to work for Moore's investment companies.

¶ 28 The plaintiff testified that Moore did not spend Thanksgiving or Christmas with the plaintiff in 2015 and did not attend the parties she threw that involved Moore's family during that

time. The plaintiff filed for divorce from Moore in January 2016 in Ohio, with Moore countersuing for divorce, and the court there determined that January 30, 2016, was the final determination date for property division purposes. While the divorce case had not ended at the time of trial in this matter, the marriage had been dissolved. Moore and the defendant were subsequently married on October 1, 2022.

¶ 29    The defendant testified that she did not initiate the relationship with Moore; did not make any invitations to Moore; did not initiate physical contact with Moore; did not direct Moore to take any action regarding his divorce; and did not initiate any contact with the plaintiff at any time in 2015. The plaintiff testified that she was not present for any of the conversations between the defendant and Moore. She had no independent knowledge of the inception of the relationship; who made invitations; who made the first gesture in the relationship; how Moore came to arrive at the defendant's home for the first time in June 2015; whether Moore stopped wearing a wedding ring in the defendant's presence; whether Moore invited the defendant to Ohio for the first time in June 2015; whether Moore invited the defendant to see him in New York in August 2015; whether the defendant invited Moore to her home in September 2015; or, whether the defendant ever asked Moore to leave his family or seek a divorce.

¶ 30    Moore testified that he was the driving force behind the progress of the relationship with the defendant, stating, "Everything I do, I am the driving force." He said that there was nothing the defendant did from the time he met her until the plaintiff filed for divorce that impacted or affected the marriage to the plaintiff. He further testified that the defendant never asked him to take any action regarding the marriage, and that she did nothing to impact his decision regarding the marriage.

11

¶ 31 After the trial, on February 13, 2024, the plaintiff filed her posttrial brief addressing, among other things, the issues of venue and choice-of-law. The plaintiff's brief concluded that venue was proper in Madison County, Illinois, pursuant to the defendant's residence within that location. Regarding choice-of-law, the plaintiff further argued that, because the defendant did not raise the issue, any argument that Illinois law should not apply had been waived, and that Illinois law should apply because "the most significant parts of the tort act occurred in Madison County, Illinois." In support she noted that the defendant hosted Moore in her home, in her bed, and had sexual relations with him there "non-stop." The plaintiff also alleged that the defendant had phone contact with Moore while domiciled in Illinois. Addressing the third element of the cause of action, the overt acts of enticement by the defendant, the plaintiff again argued that Moore was hosted in Madison County, Illinois, for "non-stop sex." The plaintiff also noted that the defendant purchased flights to visit Moore, wrote Moore a love letter, initiated telephone contact with Moore, and concealed the affair from her employer. The plaintiff did not address the extraterritorial effect of the Act.

¶ 32 In her responsive brief, filed March 22, 2024, the defendant first agreed that she was a resident of Madison County, Illinois, and further acknowledged that "at least some of the overt acts" occurred in Madison County. She then argued that any acts alleged to have occurred outside of Illinois would have no relevance, that subject matter jurisdiction could not be waived, and that Illinois courts were without jurisdiction to consider conduct that occurred outside of the state. The defendant then argued that the Act had no extraterritorial effect, and that the trial court therefore must only evaluate the plaintiff's claims regarding acts that occurred in the state of Illinois.

¶ 33 The trial court issued its ruling by written order on May 31, 2024, first noting that the plaintiff and Moore were married in Florida, were residents of Ohio, and that the defendant was a secretary employed in Missouri. The trial court then agreed with the plaintiff's conclusion that the

12

defendant set out to "steal [p]laintiff's husband," and identified the defendant's text about losing her job, the $100,000 payment the defendant received after corporate personnel learned of the affair, and the anonymous letters as evidence supporting that conclusion. In discussing those anonymous letters to the plaintiff, the trial court made a finding that the defendant did send them. The trial court made an additional finding that the defendant's seduction of Moore and its genesis occurred at the St. Louis office. It further found that the acts in furtherance of the seduction occurred across multiple states including Missouri, Ohio, New York, Florida, and Illinois. The trial court noted that the first date took place in Missouri, the first sexual encounter took place in Ohio, most of the further interactions took place outside of Illinois, and "all that occurred in Illinois regarding the *** relationship were sexual encounters."

¶ 34     The trial court indicated that Illinois courts give a narrow construction to the Act. It then stated that under a narrow construction analysis, the Act was not intended to be given an extraterritorial effect. The trial court then found that the Act did not apply, as the case involved an Ohio marriage that was broken up in Missouri. The trial court ordered that, "because the locus of the marriage in question was in Ohio and the most significant events in the seduction of Plaintiff's husband occurred in Missouri," judgment was entered in favor of the defendant. The plaintiff filed her timely appeal, and the defendant filed her timely cross-appeal.

¶ 35                                    II. ANALYSIS

¶ 36     The plaintiff appeals the judgment for the defendant, arguing that the trial court erred when it (1) applied a narrow construction standard to determine the extraterritorial effect of the Act, (2) conducted an improper *sua sponte* choice-of-law analysis in violation of the plaintiff's due process rights, and (3) determined that the Act did not apply. To succeed on a claim for alienation of affections, the plaintiff must prove three elements: (1) love and affection of the alienated spouse

13

for the plaintiff; (2) actual damages incurred by the plaintiff; and (3) overt acts, conduct, or enticement on the part of the defendant causing those affections to depart. *Orbeta v. Gomez*, 315 Ill. App. 3d 687, 690 (2000). In civil cases, factual determinations are reviewed under a manifest weight of the evidence standard while legal issues are reviewed *de novo*. *Samour, Inc. v. Board of Election Commissioners of City of Chicago*, 224 Ill. 2d 530, 542 (2007). Resolution of the plaintiff's appeal involves both the trial court's findings of fact and a question of law. As such, we will address the plaintiff's first issue regarding extraterritorial effect, and although not set out as a specific issue, we will address the trial court's findings of fact. Finally, we will conduct an analysis of the plaintiff's issue regarding due process.

¶ 37                    A. Extraterritorial Effect Analysis

¶ 38    Extraterritorial means "[o]ccurring outside a particular state or country; beyond the geographic limits of a particular jurisdiction." Black's Law Dictionary (12th ed. 2024). The long-standing rule of statutory construction in Illinois holds that "a statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute." (Internal quotation marks omitted.) *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 184-85 (2005). Before examining how this rule applies to the Act, we address the plaintiff's argument that the trial court erred in considering *sua sponte* any issue relating to "extraterritorial effect/choice-of-law." The plaintiff argues that the defendant did not raise the issue and, therefore, forfeited or waived it. In support, the plaintiff notes that it is improper for an Illinois court to consider issues not raised by the parties. She concludes that because "choice-of-law/extraterritorial effect" was not raised by the parties, it should not have been considered by the trial court.

14

¶ 39    Throughout her argument, the plaintiff repeatedly combines the issues of choice-of-law and extraterritorial effect in this manner. The plaintiff does this apparently in furtherance of her additional argument that the trial court did a "mashup" analysis, improperly combining multiple issues to arrive at its conclusion that the Act did not apply. We will discuss the trial court's method of analysis below, but we first note that combining these two issues for the purpose of arguing that the trial court should not have conducted its analysis *sua sponte* is improper. Choice-of-law and extraterritorial effect are related, but not identical, concepts. See *id.* at 190 (because the issue was decided on the statutory interpretation basis of extraterritorial effect, it was unnecessary for the court to determine whether choice-of-law rules had been violated). While extraterritorial effect involves the geographic limits of the laws of a particular jurisdiction, choice-of-law involves the question of which jurisdiction's law should apply in a given case. Black's Law Dictionary (12th ed. 2024). The plaintiff's argument as to whether a choice-of-law analysis may be conducted by a court *sua sponte* is inapposite; the parties agreed that Illinois law was to be applied, and the trial court made its decision based on the Act's lack of extraterritorial effect. A determination as to extraterritorial effect is a matter of statutory construction that does not involve the application of choice-of-law rules. *Avery*, 216 Ill. 2d at 184-85, 190. Thus, extraterritorial effect is not an issue to be raised or waived, but rather, it is a means to guide courts in their determination of whether a statute applies to the set of facts before the court. As our supreme court has explained:

> "Canons of statutory construction cannot be forfeited because they are not arguments. They are the principles that guide this court's construction of statutes. Canons of statutory construction are utilized in every statutory construction case whether a party raises them or not. To hold that canons of statutory construction are subject to forfeiture would mean that this court's construction of a particular

15

statute could change from case to case depending on whether a party cited a particular [canon]. This obviously cannot be so." *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 462 (2010).

¶ 40   It is clear from the plain language of the order that the trial court conducted an extraterritorial effect analysis, not a choice-of-law analysis. As the rules of statutory construction are not forfeited by the failure to raise them at the trial court level and are not required to be raised by a party for a court to apply them, it was proper for the trial court to engage in an analysis of statutory construction, the extraterritorial effect analysis, *sua sponte*. Accordingly, we find no error in the trial court's engaging in such an analysis.

¶ 41   The plaintiff further argues, however, that the trial court did not simply engage in an extraterritorial effect analysis, but rather, that it conducted a "mashup" analysis without citation to authority, narrowly construing the Act to determine that it had no extraterritorial effect. This argument fails. The plaintiff is correct that the provisions of the Act are to be given liberal construction under section 7 (740 ILCS 5/7 (West 2014)), which states, "This act shall be liberally construed to effectuate the objects and purposes thereof and the public policy as herein declared." The extraterritorial effect rule, however, does not distinguish between statutes that are to be liberally construed versus those that are to be narrowly construed. To have extraterritorial effect, a statute must demonstrate a *clear intent* by the legislature that it have an extraterritorial effect, and such clear intent must manifest *through an express provision* of the statute. *Avery*, 216 Ill. 2d at 184-85. A general statement that a statute is to be liberally construed is not an express provision indicating extraterritorial applicability. See *id.* at 186-87 (statute was to be liberally construed and did not have extraterritorial effect). Our review of the Act, as it existed in 2015, reveals no express provision indicating a clear intent of the legislature that the Act have an extraterritorial effect. See

16

740 ILCS 5/0.01 *et seq.* (West 2014). Accordingly, we affirm the trial court's determination that the Act has no extraterritorial effect.

¶ 42                                    B. Trial Court's Factual Determinations

¶ 43    Having concluded that the Act does not have extraterritorial effect, we turn to the question of whether, and to what degree, the actions supporting the alienation of affections claim in this case occurred in Illinois. The *Avery* case was a class action where the plaintiffs alleged, *inter alia*, that the defendant insurance company violated section 2 of the Consumer Fraud and Deceptive Business Practices Act (Fraud Act). *Avery*, 216 Ill. 2d at 179; 815 ILCS 505/2 (West 1998). Our supreme court found that the Fraud Act had no extraterritorial effect and employed a liberal construction to also hold that an out-of-state plaintiff could pursue a cause of action under the Fraud Act only if the "bulk of the circumstances" regarding a disputed transaction occurred "primarily and substantially" in Illinois, declining to limit that analysis specifically to the place of the injury. *Avery*, 216 Ill. 2d at 185-87. The *Avery* court explained that "each case must be decided on its own facts," and held that, because the overwhelming majority of the circumstances relating to the out-of-state plaintiffs' claims occurred primarily and substantially outside of Illinois, the out-of-state plaintiffs' claims fell outside the scope of the Fraud Act. *Id.* at 187-89. The class, which included members whose claims took place primarily and substantially outside of Illinois, should not have been certified. *Id.* at 190.

¶ 44    We find *Avery* to be instructive in this case, where there is an alienation of affections cause of action with no extraterritorial effect, and the facts relating to the three elements of the cause of action occurred in more than one state. Therefore, under *Avery*, the trial court's task was to determine whether the bulk of the circumstances supporting the elements of the cause of action occurred primarily and substantially in Illinois. The trial court did not, however, expressly set forth

17

the "primarily and substantially" standard when it applied the rule to the facts of this case. Instead, the trial court made several findings of fact, including that "[a]s near as th[e] Court [could] tell, all that occurred in Illinois *** were sexual encounters," and then concluded that the Act did not apply because "this was an Ohio marriage that was broken up in Missouri." The trial court further stated that "the locus of the marriage in question was in Ohio and the most significant events in the seduction of the Plaintiff's husband occurred in Missouri."

¶ 45 While the "most significant events" standard is not precisely identical to the "primarily and substantially" standard that the trial court was required to employ, this court may affirm a trial court's judgment on any basis supported by the record, regardless of the reasoning employed by the trial court. *Scassifero v. Glaser*, 333 Ill. App. 3d 846, 860 (2002). The plaintiff argues that the facts occurring in Illinois were sufficient to bring the cause under the Act. We examine the trial court's order and the record to determine whether the trial court's holding that the most significant events in the seduction occurred in Missouri supports a determination that the actions occurred "primarily and substantially" outside of Illinois.

¶ 46 In its May 31, 2024, order, the trial court made findings relating to the first and third elements of the alienation of affections claim. The only findings of the trial court relating to the love and affection of the alienated spouse for the plaintiff was that the plaintiff and Moore were married in Florida, and that their primary residency was in Ohio.

¶ 47 Relating to the overt acts, conduct, or enticement on the part of the defendant causing Moore's affections to depart, the trial court found that the defendant's employment was in St. Louis, Missouri. It further found that the defendant intentionally set out to steal Moore from the plaintiff because the defendant was going to lose her job, evidenced in part by writing anonymous letters to the plaintiff about the affair. Regarding the defendant's seduction of Moore, the trial court

18

found that those actions initiated and took place at the corporate headquarters in Missouri, and then took place across many states, including Missouri, Ohio, New York, Florida, and Illinois. Additional relevant findings included that the defendant and Moore's first date occurred in St. Louis, and their first sexual encounter occurred in Ohio. The trial court found that all that occurred in Illinois regarding the relationship were sexual encounters, and that the most significant events of the seduction occurred in Missouri.

¶ 48    When a trial court makes a finding by a preponderance of the evidence, this court will reverse that finding only if it is against the manifest weight of the evidence. *Best v. Best*, 223 Ill. 2d 342, 348-49 (2006). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Id.* at 350. Under the manifest weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *Id.* A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn. *Id.* at 350-51.

¶ 49    There is ample evidence in the record to support the trial court's finding that the most significant events in the seduction of Moore occurred in Missouri and across several states. The evidence at trial established that, in 2015, the defendant and Moore were together on at least six occasions in Missouri at the St. Louis office and went on dates in Missouri on two occasions. By the second date, Moore had removed his wedding ring while in the defendant's presence and told her that he was going through a divorce. Up to this point, Moore had never been with the defendant in Illinois. They were together in Ohio in 2015 on seven occasions. They were also together in Florida on one occasion and in New York on one occasion. The evidence established that they

19

were together in Illinois on only three to four specific occasions; while the testimony potentially implied that there were more occasions in Illinois, where references were made to multiple instances of Moore staying with the defendant when he came to the area for work, specific instances of those visits were never explored. Indeed, the plaintiff did not seek to elicit even an estimated total number of visits to Illinois. Adding to the uncertainty, Moore testified that he would sometimes stay at a hotel or at the company condominium when he came to the area throughout June and July of 2015.

¶ 50    Despite notice from the trial court directly prior to trial that the location of the overt acts would be an essential component of the case that would require posttrial briefing, the plaintiff did not establish or even seek to establish how many additional times Moore visited the defendant in Illinois. She further did not elicit where Moore met the defendant's children, where Moore met the defendant's other family members, or the defendant's location during the extensive telephone contact between the two. Further, while the plaintiff alleges in her brief that some of the anonymous letters sent to her by the defendant were postmarked from Illinois, at trial she testified that none of them were.

¶ 51    There were also no questions regarding what occurred on the three to four occasions where Moore was known to be at the defendant's home other than to establish that sexual encounters occurred, and on the first occasion Moore slept at the home, took a shower, and met the defendant's son. "The questionable act of sexual intercourse in and of itself *** would not alone constitute proof that the defendant was blamable or had the necessary willful intent necessary to support the third element of a *prima facie* case." *Wheeler v. Fox*, 16 Ill. App. 3d 1089, 1094 (1974). Ultimately, the plaintiff "proved no overt acts in the nature of enticement" occurring within Illinois. *Id.*

20

¶ 52    Under these facts, it is not clearly evident that the trial court's finding that the most significant events in the seduction occurred in Missouri and across multiple other states was unreasonable, arbitrary, or not based on the evidence presented. While there may be subtle discrepancies in the meaning of the "most significant events" language employed by the trial court versus the "primarily and substantially" language prescribed by our supreme court, we reiterate that as a reviewing court we may affirm the trial court's judgment on any basis supported by the record, regardless of the reasoning employed by the trial court. *Scassifero*, 333 Ill. App. 3d at 860.

¶ 53    The record in this case indicates that the facts relating to the first element, love and affection between the spouses, existed primarily and substantially in Ohio and Florida. The facts relating to the second element, damages, were primarily and substantially located in Ohio and Missouri. The alleged damages in these states included millions of dollars in lost potential shared income, as opposed to in Illinois where a single home décor purchase amounted to less than $2,000. Finally, the facts relating to the third element, the overt acts by the defendant, occurred substantially and primarily in Missouri, and also involved Ohio and other states, where at least 17 rendezvouses occurred outside of Illinois. The nine anonymous letters were also mailed from outside of Illinois.

¶ 54    In contrast, only three to four rendezvouses were established at trial to have occurred in Illinois, and no evidence was elicited regarding overt acts of seduction occurring on those occasions. The trial court's determination that the significant events supporting the cause of action did not occur in Illinois was not unreasonable, arbitrary, or not based on the evidence presented, and therefore was not against the manifest weight of the evidence. Accordingly, the trial court's determination that the Act did not apply was not error where the record supports a determination that the events occurred primarily and substantially outside of Illinois.

21

¶ 55                                    C. Due Process

¶ 56    We finally address the plaintiff's argument that she was denied due process in violation of the fourteenth amendment of the United States Constitution and article I of the Illinois Constitution where she presented her case at trial based on the strategies and positions of the parties at the time of trial, and the issues of choice-of-law and extraterritorial effect were not before the court. U.S. Const., amend. XIV; Ill. Const. art. I, § 2. She claims that the trial court's resolution of the matter on an issue not before the court denied her notice and the opportunity to be heard.

¶ 57    The record contradicts the plaintiff's claim. On the first day of trial, prior to opening statements, the trial court stated, "I have a serious concern and issue as to what the choice of law is and *the viability of an alienation of affection case in the state of Illinois* where the marriage appeared to be *** in the state of Ohio and an employment that was located in *** St. Louis." (Emphasis added.) Shortly thereafter, the trial court again stated, "So I have a serious concern *** what the choice of law is and/or which is sort of *a different issue perhaps* or combined with *the viability of a claim if it's in Illinois*." (Emphases added.) The plaintiff responded that the tort had been alleged to have occurred in Illinois and it was therefore ripe in Illinois. The trial court stated that it would be asking the parties to brief the issue.

¶ 58    The trial then took place from December 11 through December 15, 2023. The defendant testified on December 11 and 12, and she was present at trial and available to be called to provide testimony on all five days. Moore testified on December 14 and 15. The plaintiff filed her posttrial brief on February 13, 2024, approximately two months after receiving notice that viability of the claim in Illinois based on the location of the events was at issue. In her posttrial brief, she argued that choice-of-law arguments had not been raised by the defendant and had been waived, and that the case should be decided under Illinois law. While not specifically using the phrase

22

extraterritorial effect, the plaintiff argued that the most significant parts of the tortious conduct of the defendant occurred in Illinois. In support, she referenced the sexual acts that occurred in Illinois and claimed that the defendant called and texted Moore while domiciled in Illinois. The defendant then filed her brief on March 22, 2024, wherein she specifically referenced *Avery*'s extraterritorial effect provisions. The trial court entered its judgment for the defendant on May 31, 2024.

¶ 59 Due process requires notice to be in a form reasonably calculated to convey the required information, and it must give the affected person a reasonable time to act. *Grimm v. Calica*, 2015 IL App (2d) 140820, ¶ 15. The trial court explained to the parties before trial began that it was concerned about the issues of choice-of-law, and of the "different issue perhaps" of the viability of the claim under Illinois law pursuant to the location of the relevant facts. The plaintiff responded that Illinois was where the tort was alleged to have occurred, and the trial court explained to her that "the allegation of the tort occurring in Illinois did not necessarily amount to the occurrence of the tort in Illinois." The plaintiff then had five days of trial to review the issue and augment her presentation to include specific evidence of overt acts by the defendant in Illinois to address the trial court's concerns.

¶ 60 Afterward, the plaintiff had two months to further investigate the issue before filing her posttrial brief. While she never specifically referred to extraterritorial effect, she set forth in her brief facts occurring in Illinois that she believed were sufficient to bring the case under the Act. She never moved to reopen proofs to elicit additional evidence based on her review of the issue prior to filing that brief.

¶ 61 Three-and-a-half months then passed between the plaintiff filing her brief and the trial court entering its judgment. Approximately one month into that period, the defendant filed her responsive posttrial brief and cited *Avery*, explicitly referring to the issue of extraterritorial effect.

23

Over two months passed after the defendant's brief was filed before the trial court's judgment was entered, but the plaintiff again never moved to respond or reopen proofs to supplement the evidence and address the issue.

¶ 62　Both the trial court's discussion with the parties before the start of trial and the defendant's posttrial brief conveyed the information required to put the plaintiff on notice of the extraterritorial effect issue. She then had five days of trial to elicit evidence addressing the issue, and five-and-a-half months posttrial to research the issue further and request the opportunity to pursue additional evidence in support of her position. She did not act other than to insist in her own posttrial brief that she had presented adequate evidence for Illinois law to apply. Because the required information was conveyed to the plaintiff, and because she had a reasonable amount of time to act, notice and the opportunity to be heard were provided. Accordingly, we hold that no denial of due process occurred.

¶ 63　We have reviewed the plaintiff's motion to supplement the record in this appeal, as well as the proposed supplementary documents, both emailed to the trial court posttrial and neither of which was filed. The supplementary documents consist of the proposed findings of fact by the plaintiff and the proposed judgment order by the defendant. Neither document offered as proposed amendments to the record would affect the outcome of this appeal, and the motion to supplement is therefore denied. Finally, because we affirm the trial court's judgment, the issues raised by the defendant on cross-appeal are moot.

¶ 64　　　　　　　　　　　　　　III. CONCLUSION

¶ 65　We affirm the trial court's judgment where the trial court correctly decided the extraterritorial effect issue, the trial court's factual findings were not against the manifest weight of the evidence, the acts supporting the cause of action did not primarily and substantially occur

24

in Illinois, and the plaintiff was not denied due process. Having affirmed the judgment, the cross-appeal is rendered moot.

¶ 66    Affirmed.